Charles HAMILTON, Petitioner,

v.

David L. MILLER, Superintendent of Eastern Correctional Facility, Respondent.

Nos. 01–CV–4355 (JBW), 03–MISC–0066 (JBW).

United States District Court, E.D. New York.

Nov. 19, 2003.

Charlita Mays, Richard Spears Kibbe & Orbe LLP, Lawrence E. Jacobs, Davis Polk & Wardwell, New York City, for Petitioner.

Steven A. Hovani, Suffolk County District Attorney's Office, Riverhead, NY, for Respondent.

## MEMORANDUM, JUDGMENT & ORDER

WEINSTEIN, Senior District Judge.

Petitioner, represented by counsel, makes serious allegations of police misconduct—planting of evidence—in connection with a conviction for murder. Ironically, as a result of this proceeding it is now evident that it is the arresting officer rather than the convicted murderer who got a bum rap. *See* Robert L. Chapman, Dictionary of American Slang (3d Ed.1995) ("Any unjustified condemnation.").

If substantiated, the claims of malfeasance would have raised a serious question of whether the denial of a fundamentally fair trial could go uncorrected by a federal habeas court even where a petition, like that filed here, is untimely under the strict rules adopted by Congress. The claims were not substantiated.

An extensive evidentiary hearing in this court was required to determine whether a police detective planted evidence on petitioner and whether the prosecution suppressed proof of this misconduct in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Petitioner was represented by able counsel. He was present by telephone. Both parties called fact and expert witnesses.

The hearing established that no police misconduct occurred and that there was no *Brady* violation. Petitioner has failed to demonstrate that he is actually innocent of the crime for which he was convicted. Because the habeas petition was filed well outside of the limitations period established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the petition for a writ of habeas corpus is dismissed as time-barred.

## I. Facts and Procedural History

### A. Investigation and Trial

In February 1982, Abraham Squires was fatally shot in an apparent attempted robbery of participants in a local card game in Amityville, New York. Squires, who was the gaming house manager, was shot in the head with a .22 caliber bullet fired by one of four robbers. None of the card players saw the shooting because they were in another part of the gaming house.

A police investigation, headed by Detective Dennis Rafferty, was initiated. Tips from informants eventually led Detective Rafferty to Roderick Morris, who professed to be an eyewitness to the attempted robbery. He was interviewed in jail because he had recently been arrested for a crime unrelated to the killing of Squires.

Morris explained at trial, as he had to the detective, that four men—petitioner, Sean Baptiste, Joe Byrd and Buford Byrd—committed the attempted robbery. He described speaking with Buford Byrd prior to the incident and being offered the opportunity to join the four in the "stick-up." Trial Tr. at 405. Morris refused, but observed the preparations for the robbery. According to Morris, petitioner was carrying an automatic pistol. He observed the four approach the gaming house; petitioner cocked his gun. Morris then saw Joe Byrd knock on the door while the others stood to the side. Apparently recognizing Byrd, Squires opened the door. Morris then left, but stated that he heard a gunshot and a scream.

Morris spoke with Buford Byrd the next day at a poolroom. Byrd told him that Squires had jumped at them after they announced that "it was a stick-up." *Id.* at 414. Squires was pushed down the stairs, after which Byrd heard a shot.

All four of the men identified by Morris were eventually arrested. Detective Rafferty interrogated petitioner, who signed a writing confessing to the attempted robbery and the shooting, but indicating that the shooting had been unintentional. Details in the statement were consistent with the testimony provided by Morris.

■ The statement was never introduced at trial. After a *Huntley* suppression hearing, the court found that petitioner's statements were voluntary and made after he had been given *Miranda* warnings but that they had to be suppressed because Detective Rafferty had failed to inquire whether petitioner was represented by counsel. Petitioner was, in fact, represented by counsel on pending unrelated charges at the time. Pursuant to New York law, as explicated in *People v. Rogers,* 48 N.Y.2d 167, 422 N.Y.S.2d 18, 397 N.E.2d 709 (1979), under such circumstances interrogation by police outside of the presence of counsel may not proceed: "*Rogers* establishes and still stands for the important protection and principle that once a defendant in custody on a particular matter is represented by or requests coun-

sel, custodial interrogation about any subject, whether related or unrelated to the charge upon which representation is sought or obtained, must cease." *People v. Burdo*, 91 N.Y.2d 146, 667 N.Y.S.2d 970, 690 N.E.2d 854, 855 (1997).

One of the four alleged perpetrators, Sean Baptiste, agreed to plead guilty to reduced charges in return for his testimony against petitioner and Buford Byrd. Like petitioner, Baptiste had confessed to his participation in the crime. Baptiste testified that Buford Byrd had told him of an impending robbery earlier on the night of the incident. He witnessed petitioner attempting to get into the house when petitioner's gun went off.

Petitioner's girlfriend was called by the prosecution. In grand jury testimony she had stated that petitioner was in possession of a gun and intended to commit a robbery and that after the incident he told her that he had shot a man in the face. At trial she was hesitant to answer questions, but did testify that she saw petitioner soon after the incident and was told by him that "I just shot a man," and "I shot a man in the face." Trial Tr. at 619, 620. She largely refused to answer questions from either the prosecutor or defense counsel, indicating that she was afraid that her testimony might result in her losing custody of her daughter. A transcript of her grand jury testimony was presented to the jury with instructions that it could be used to impeach her credibility but not as proof of facts or as a substitute for her testimony.

An assistant district attorney testified that he heard petitioner make inculpatory statements at the arraignment. After telling the trial court that the prosecution was preparing to bring intentional murder charges against him, petitioner allegedly "indicated, words to the effect, that he did it, but he didn't intend or didn't mean to kill the person." Trial Tr. at 348. The assistant district attorney did not memorialize the statement and the transcript of the proceedings does not reflect that the statement was made. The judge presiding over the hearing did not hear it. A sheriff's deputy, an associate court clerk, and a senior court clerk, however, testified respectively that petitioner said, "it wasn't intentional ... I didn't mean to shoot him," Trial Tr. at 823; "I didn't do it on purpose," *id.* at 292; and "I didn't mean to shoot him," *id.* at 307.

The slug found in the deceased's body had come from a .22 caliber gun with rifling in the barrel. That gun was never recovered.

The jury was presented with a .22 caliber unexpended round that Detective Rafferty testified he recovered from petitioner's pocket when he arrested him seven months earlier. Tests on the .22 caliber round were compared by ballistics experts to a single .22 caliber expended shell casing recovered from the crime scene. According to the expert, microscopic comparisons of the cartridge extractor marks—unique marks left on a shell casing after it has been placed in a handgun and then separated from the weapon when it is either fired or unloaded—showed that the round recovered from petitioner and the shell casing recovered from the crime scene "matched." Trial Tr. at 750. According to the expert, both the .22 caliber round in petitioner's pocket and the .22 caliber shell casing at the murder scene had at one time been in the same weapon. *Id.* at 751. The casing at the scene was ejected as a result of the gun being fired; the unexpended round in petitioner's possession had been removed by hand.

It could not be determined through ballistics that the lethal slug and the two shell casings had been in the same gun, although it could be inferred that that was the case. It could also be inferred that the

gun was an automatic or semi-automatic due to the fact that a shell casing was left at the scene—an infrequent occurrence where a revolver has been used—and because of the markings on the shell casing.

Defense counsel cross-examined Detective Rafferty vigorously concerning the evidence reportedly found in petitioner's pocket. He established that there was no record of the recovery of this round in his arrest report, that the round was not vouchered and that the assistant district attorney did not discover the existence of the round until just before a pretrial hearing. Detective Rafferty's explanation for why he did not voucher a .22 caliber live round found in the pocket of a suspect arrested for murdering someone with a .22 caliber firearm was that he did not believe it was relevant; he had merely put it in an envelope and stapled the envelope to the case file. *See* Trial Tr. at 581; Pretrial Hr'g Tr. at 76.

Defense counsel sought to convince the jury that the eleventh hour revelation by Detective Rafferty that he had discovered the round in petitioner's pocket was unworthy of belief. In response, the prosecutor told the jury in his summation:

> I ask you when you go into that jury room and you're thinking about Rafferty's testimony, use your common sense. This is a paid police officer. He is going to get paid every two weeks no matter what we do in this courtroom. Theoretically, he couldn't care less. If he was going to frame somebody—this is a trained homicide detective—don't you think he could do a far better job? Remember, Rafferty is not on trial here. Don't lose sight of the issue.

> . . . . .

> He's been criticized for not submitting the cartridge until April the 27th. But again I ask you: What difference does that make: He put it in a plastic envelope. He put it with the case file and then he forgot about it because he works on numerous other homicides in the county. *You don't really think for a moment that Detective Rafferty got that cartridge from someplace other than where he told you? It matches the casing found at the scene. Where could he possibly get it from? Why would he say that [petitioner] had it in his pocket if he didn't?* ... It doesn't make any sense to say Detective Rafferty is lying about it. It defies logic.

Trial Tr. at 1096, 1111–12 (emphasis added).

The importance of the live round recovered on petitioner's person at his arrest was emphasized by the prosecutor elsewhere in the summation:

> Morris testified that [petitioner] had an automatic pistol. [The ballistics expert] testified that the casing found at the scene and the live round found on [petitioner] on April 12th had been chambered in the automatic pistol. All the witnesses have testified to hearing one shot. There was one bullet hole in Mr. Squires' head; a .22 caliber Remington Peters slug removed from Mr. Squires' brain; a single .22 caliber Remington Peters expended cartridge found at the head of the stairs right where Mr. Squires is lying. If that casing didn't come from the murder weapon, where did it come from? If it didn't[,] then where was the expended casing that put the bullet into Mr. Squires' head? If it did come from the murder weapon, that means that the bullet found on [petitioner's] pocket on April 12th had also been chambered once in the murder weapon. If the automatic is used, one shot, one hole in the head, one bullet in the brain, a .22 caliber Remington Peters, and there is one .22 caliber Remington Peters casing found at the scene ejected from an automatic. I submit to you that

the casing found at the scene was ejected from the murder weapon.

Trial Tr. at 1107.

Petitioner was convicted of second degree (felony) murder and first degree attempted robbery. He was sentenced to 25 years to life in prison.

His conviction was affirmed by the Appellate Division on direct appeal. Leave to appeal to the New York Court of Appeals was denied. In a *pro se* supplemental brief on the direct appeal, petitioner had argued that the sudden appearance of the round allegedly found in his pocket, notwithstanding Detective Rafferty's failure to properly record and keep it, suggested a violation of *Brady* and that it should have been suppressed.

### B. FOIL Request and Alleged Police Misconduct

In 1989, seven years after the killing, petitioner made a New York Freedom of Information Law ("FOIL") request for "copies of all police reports and photographs made by members of the Suffolk County Police Department concerning the homicide investigation under Indictment Number 1479–82," the one under which he was prosecuted. In response, he received in January 1990 a previously undisclosed police report indicating that on February 19, 1982, which was five days after the shooting and a month before petitioner was a suspect—a detective investigating the murder with Detective Rafferty recovered (1) a .22 caliber Winchester Western round; (2) six rounds of Remington–Peters .22 caliber ammunition; and (3) a one-hundred year-old .22 caliber revolver and holster.

As pointed out in Part III, Analysis, *infra*, this .22 caliber revolver had a smooth bore and was not an automatic, so it would not have been the murder weapon. When fully loaded it could have held seven rounds, which could be either "short" or "long" and Winchester Western or Remington–Peters, in any combination.

The unexpended round that Detective Rafferty stated at the suppression hearing he had recovered from petitioner's pocket, and which a ballistic expert testified had at one point been loaded in the probable murder weapon, was a .22 caliber Winchester Western round. The police report thus suggests an answer to the prosecutor's questions to the jury on summation: "You don't really think for a moment that Detective Rafferty got that cartridge from someplace other than where he told you? It matches the casing found at the scene. Where could he possibly get it from?" The answer might have been that the round was taken from the evidence room.

In connection with a motion to vacate judgment subsequently filed by petitioner, the district attorney's office attempted to compare the round allegedly found in petitioner's pocket with the seven rounds noted in the police report. The result of the comparison was stated as follows: "Ammunition submitted under Lab Number 282–12071 (six 22 caliber *short* cartridges) *are not* the same as ammunition submitted under Lab Number 1082–16280 (one .22 Caliber *long* cartridge)." Feb. 26, 2000 Report. The ballistics report makes no mention of a comparison of the Winchester Western round recovered on petitioner with the Winchester Western round related to the smooth-bore .22 noted in the police report. This led the petitioner to sensibly argue that no such comparison could have been made because the two rounds were one and the same.

Fueling petitioner's theory that evidence was planted on him by Detective Rafferty are the results of an investigation conducted by the State Commission of Investigation of malfeasance by the Suffolk County District Attorney's Office and Police Department. Detective Raffer-

ty was one of the foci of the investigation, which was conducted in the Spring of 1989. Among the Commission's general findings was that the "Suffolk County Police Department and District Attorney's Office engaged in and permitted improper practices to occur in homicide prosecutions, including perjury, as well as grossly deficient investigative and management practices" and that there was "a pervasive lack of documentation, and defective documentation, in Suffolk Police and District Attorney investigations in areas which the Commission has examined: homicide and narcotics cases ... and investigations by detectives in general." Report at 28–29.

The Commission noted that Detective Rafferty had a "convenient talent for producing crucial testimony and evidence at the 11th hour in homicide prosecutions." *Id.* at 66. It relied in part upon the detective's deportment in the instant case:

> In the *Hamilton* case, only after a confession was ruled inadmissible was a .22 caliber bullet, which had allegedly been found by Detective Rafferty in the pocket of a defendant when he was arrested, produced as evidence. As it turned out, this bullet had the same ejection marks as that produced by the murder weapon, a .22 caliber pistol. Rafferty testified at a pre-trial hearing that he had failed to send this bullet for ballistics tests when it was found on the defendant; instead he had put it, without any label, into the file folder, which the Commanding Officer of the Homicide Division testified at the Commission's hearing constituted a violation of Department Rules and Procedures (Public Hearing, 1987, petitioner. 755–759). Later, after the confession in the case was ruled inadmissible, the bullet was sent to ballistics and found to match the murder weapon. There were no notes or written references concerning the bullet anywhere prior to the confession being ruled inadmissible.

> Rafferty explained away his failure to send the bullet for tests with two equally damning explanations. First, he claimed never to have had any training in ballistics (Public Hearing, 1987, p. 718)—astounding for a detective who served 17 years in the Homicide Division. Second, he explained, "every black guy in Amityville has a .22," so he did not think the .22 caliber bullet was important. (Rafferty, Private Hearing, p. 129), which just as surely demonstrates how lacking in judgment was this veteran homicide detective.

*Id.* at 65–66. Petitioner notes that not long after the Commission's hearing, Detective Rafferty was transferred from the Homicide Division to the Robbery Squad.

C. Instant Habeas Application and Subsequent State Court Proceedings

Petitioner filed an application for a federal writ of habeas corpus on April 14, 1997, just days before the AEDPA filing deadline for convictions that became final prior to April 24, 1996, the effective date of the act. In the application he made two claims: (1) that *Brady* material was withheld from him by the prosecution; and (2) that new evidence (the undiscovered police report, the Suffolk County report, and affidavits retracting the testimony of two prosecution witnesses) demonstrates he was deprived of a fair trial in violation of his due process rights. Because he had not exhausted his state remedies, petitioner withdrew his application in January 1999.

Petitioner then did nothing in any court until August 2000, when he filed a motion to vacate judgment before the state trial court. He argued that newly discovered evidence and a *Brady* violation warranted a new trial. The trial court denied his motion, finding that petitioner's "newly discovered evidence" claim was defaulted

because petitioner had not proceeded with the statutory due diligence required to merit a new trial. In particular, the court noted that petitioner had received the undisclosed police report in January 1990, more than ten years before he filed his motion to vacate judgment. The court denied petitioner's *Brady* claim on the ground that petitioner had failed to establish that the police report turned over to him pursuant to a FOIL request "in any way related to the crimes charged" in his indictment. Dec. 5, 2000 Decision at 6.

Denial of the motion to vacate judgment was affirmed by the Appellate Division. Petitioner then refiled his habeas corpus application in federal court on July 27, 2001.

### D. Evidentiary Hearing in Federal Court

Troubled by petitioner's substantial showing that he may have been denied a fundamentally fair trial as a result of egregious police misconduct in the instant case, this court ordered an evidentiary hearing. Respondent was directed to:

(1) Inform the court whether the police report bearing "central complaint number" 82–56474 that was received by petitioner pursuant to a Freedom of Information Law request is related to the homicide of Abraham Squires. If respondent is unable to do so, he shall be prepared to explain why the Report was provided to petitioner in response to his FOIL request;

(2) Explain if and why police remain in possession of the revolver and all ammunition referenced in the Report except for the .22 caliber Winchester Western bullet that was referenced in the Report;

(3) Make available, on request of petitioner's counsel, the bullet recovered from the victim, the revolver and all ammunition referenced in the Report, for comparison and ballistics testing; and

(4) Seek the attendance of Detective Dennis Rafferty at the scheduled hearing.

In addition, both parties were ordered to be prepared to address:

(1) Whether petitioner's application for a writ of habeas corpus is timely pursuant to the standards of the Antiterrorism and Effective Death Penalty Act of 1996;

(2) Whether extraordinary circumstances beyond petitioner's control prevented his timely filing of an application for a writ of habeas corpus, thus meriting equitable tolling of the limitations period;

(3) Whether, as a factual and legal matter, petitioner can demonstrate that the failure of a federal court to address his claims would result in a miscarriage of justice that would excuse the untimely filing of his application;

(4) Whether the state courts' resolution of the *Brady* issue "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d); and

(5) Any other matters deemed relevant by either party.

Detectives Rafferty and McGuire appeared as witnesses at the proceeding, as did ballistics experts for both petitioner and respondent. The police department's ballistics expert, who performed the initial

tests on the evidence in the instant case in 1982, testified. Exhibits, including new ballistics laboratory reports, were accepted into evidence. This court made a number of oral factual findings at the hearing which are encapsulated below.

Rafferty testified, as he had at trial, that he recovered a .22 caliber live round from petitioner upon his arrest. He did not send the round for ballistics testing because, although he had been a homicide detective for years, he did not know that extractor marks could in theory link the round recovered from petitioner's pocket to the spent shell casing recovered months earlier at the crime scene. Believing the round to be of no significant evidentiary value, Rafferty nonetheless placed it in an envelope and stapled the envelope to the case file. He did not voucher the round or in any other manner memorialize that he had recovered it from petitioner. He contemporaneously informed Detective McGuire that he had recovered a .22 caliber round from petitioner at the time of the arrest. In preparation for a pretrial hearing, Rafferty turned the entire case file over to an assistant district attorney, who for the first time became aware of the existence of the round. Rafferty testified that he did not know that petitioner's inculpatory statement was in danger of being suppressed at the upcoming hearing. After the hearing, at which petitioner's statement was suppressed, Rafferty sent the .22 caliber round to the police laboratory for testing. At that time, and for the first time, it was determined that it had at one time been loaded in the same weapon as the expended shell casing that was found at the crime scene. Rafferty denied "planting" the round on petitioner. He testified that he was never disciplined for his actions in the instant case and that his subsequent transfer from homicide to the robbery division was at his own request. Based on all the evidence, this court found Rafferty's testimony credible.

Detective McGuire testified that, although he did not witness Rafferty actually remove the .22 caliber round from petitioner's pocket upon his arrest, he was aware at the time that Rafferty had recovered the round from petitioner. This court found McGuire's testimony credible.

Charles Kosciuk, the ballistics examiner who initially performed tests in 1982 on the seven rounds and the revolver referenced in the FOIL report, testified concerning the preservation of that evidence and his subsequent comparison of it with the slug from the deceased's body, the shell casing recovered at the crime scene and the unexpended round taken from petitioner's pocket. He explained that in 1982 he determined that none of the seven rounds or the revolver were a match to any "open case" at the time. After the testing in 1982 he engraved lab numbers on each of the seven rounds and the revolver and placed the evidence in a heat sealed plastic envelope, which had not been removed from the evidence room until September of 2003, when comparisons with the Hamilton evidence were performed at the request of this court.

The evidence is pictured in the attached plates. Plate A shows the live round recovered from petitioner at his arrest. Plate B shows the live round—recovered with the loaded antique revolver, its holster and six other rounds—that petitioner claims was planted on him. Plate C shows the expended shell casing found at the scene of the crime.

The ballistics examiner testified that he had not physically handled the FOIL evidence when he compared it in 2000 to the Hamilton evidence, relying instead on his 1982 report for comparison. He explained that his reference in his 2000 report to "six 22 caliber short cartridges" was erroneous and that his comparison was in fact to seven cartridges, none of which he physi-

cally handled in 2000 because he was relying on observations recorded in his 1982 report and not on the physical evidence. The court found this testimony credible.

The "missing" .22 caliber Winchester round referenced in petitioner's FOIL report is not missing. The round was in a heat sealed envelope along with the other six rounds and the revolver, all engraved with the ballistic examiner's initials from 1982. As noted above, the rounds and revolver had not been removed from these envelopes until the testing performed in September 2003 in connection with the instant proceeding.

Ballistics experts for petitioner and respondent agreed in their opinions with respect to comparisons of the FOIL evidence of the revolver and seven rounds, and the Hamilton evidence of the expended shell casing, fired slug and live round. The recovered smooth-bore antique revolver could not have fired the shot that left the rifling-marked .22 caliber shell casing at the crime scene or that left the slug in the victim. The casing recovered from the crime scene and the round found in petitioner's pocket had both been chambered in the same firearm at one time—but it was not the revolver with the seven rounds because that revolver would not have left ejection marks. The experts could not determine, without actually recovering and test-firing the murder weapon, whether the firearm which held the shell casing recovered at the scene and the round recovered from petitioner's pocket is the same weapon that fired the slug recovered from the victim.

Petitioner's ballistics expert posits that the unexpended round recovered from petitioner's person by Rafferty might have been cycled through the firearm that left the extractor marks on the expended cartridge recovered at the crime scene after the slug was fired into the victim. The defense theory might be that Rafferty had the actual crime gun and he put a .22 cartridge into its chambers, extracted it without firing and then placed the marked round in petitioner's pocket—or at least said that he found it there and then hid the actual crime gun. Respondent's expert disagrees with this interpretation of the physical evidence. On this point, the police ballistics expert's analysis seems more cogent.

Petitioner's scenario is bizarre. Why would the detective use and then lose the murder weapon? This court rejects as speculative and unsupported the suggestion that any such recycling occurred in the instant case in an effort to manufacture evidence against petitioner.

Respondent's explanation for why the FOIL reports concerning the revolver and seven rounds were sent to petitioner was that it was a "bureaucratic mistake." Hr'g Tr. at 119. This is credible and is accepted in view of the circumstances. Credible too is the expert Kosciuk's explanation for a reference to six instead of seven bullets in his 2000 report.

In sum, this court finds as matters of fact that Detective Rafferty's testimony that he recovered a .22 caliber round from petitioner's pocket upon his arrest is credible. The FOIL evidence—records showing seven rounds and a revolver—are not in any way related to the instant case. They were turned over to petitioner mistakenly. Although some ineptitude was revealed, Rafferty and his partner told the truth. While Detective Rafferty may have done many of the things petitioner and the Commission accused him of, planting the .22 unexpended round on petitioner's person was not one of them. The evidence on the point is clear. In this case, at least, accusing these detectives of planting evidence on petitioner was unjustified.

## II. Law

### A. Limitations Period

█ Congress has set a one-year period of limitations for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). A conviction becomes final for habeas purposes when the ninety-day period for filing a petition for a writ of certiorari to the United States Supreme Court has expired. *See McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir.2003); *see also* Sup.Ct. R. 13.

Prisoners whose convictions became final before the effective date of Antiterrorism and Effective Death Penalty Act ("AEDPA"), April 24, 1996, had a grace period of one year, until April 24, 1997, to file their habeas application. *See Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir.1998).

█ "[T]he district court has the authority to raise a petitioner's apparent failure to comply with the AEDPA statute of limitation on its own motion." *Acosta v. Artuz*, 221 F.3d 117, 121 (2d Cir.2000). "If the court chooses to raise sua sponte the affirmative defense of failure to comply with the AEDPA statute of limitation, however, the court must provide the petitioner with notice and an opportunity to be heard before dismissing on such ground." *Id.*

In calculating the one-year limitation period, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted." 28 U.S.C. § 2244(d)(2).

█ The "filing of creative, unrecognized motions for leave to appeal" does not toll the statute of limitations. *Adeline v. Stinson*, 206 F.3d 249, 253 (2d Cir.2000); *see also Artuz v. Bennett*, 531 U.S. 4, 8, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000) ("[A]n application is *'properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.... The question whether an application has been 'properly filed' is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar." (emphasis in original; footnote omitted)).

█ In addition, the term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. *See Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir.1999), *aff'd*, 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000). "[A] state-court petition is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Bennett*, 199 F.3d at 120; *Carey v. Saffold*, 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (holding that the term "pending" includes the intervals between a lower court decision and a filing in a higher court for motions for collateral review). A motion for extension of time to file an appeal does not toll AEDPA's limitations period unless an extension is actually granted. *See Bethea v. Girdich*, 293 F.3d 577, 579 (2d Cir.2002).

█ The period of limitations set forth in AEDPA ordinarily does not violate the Suspension Clause. *See Muniz v. United*

*States*, 236 F.3d 122, 128 (2d Cir.2001) ("[T]he Suspension Clause does not always require that a first federal petition be decided on the merits and not barred procedurally" (quotation omitted)); *Rodriguez v. Artuz*, 990 F.Supp. 275, 283 (S.D.N.Y.1998) (AEDPA statute of limitations is not, "at least in general," an unconstitutional suspension of the writ).

■ The AEDPA statute of limitations is not jurisdictional and may be tolled equitably. *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir.2000). "Equitable tolling ... is only appropriate in 'rare and exceptional circumstances.' To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir.2001). Although state prisoners are not entitled to counsel as of right in either New York state collateral or federal habeas corpus proceedings, the Court of Appeals for the Second Circuit has stated that "an attorney's conduct, if it is sufficiently egregious, may constitute the sort of 'extraordinary circumstances' that would justify the application of equitable tolling to the one-year limitations period of AEDPA." *Baldayaque v. United States*, 338 F.3d 145, 152–53 (2d Cir.2003); *compare Smaldone*, 273 F.3d at 138–39 (attorney calculation error does not justify equitable tolling).

## B. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unrea-

sonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

■ An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d

100, 111 (2d Cir.2000) (internal quotation marks omitted).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker,* 341 F.3d 104 (2d Cir.2003) (amended opinion) (district court's habeas decision that relied on precedent from the court of appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary,* 340 F.3d 63, 72 (2d Cir.2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### C. Exhaustion

 In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attor-*

*ney General,* 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane,* No. 98 CIV. 1604, 2000 WL 12142, at *3 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).

### D. Procedural Bar

 A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

 If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly

invokes a state procedural rule as a separate basis for its decision).

■■■■■ When a state court "says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved." *Glenn v. Bartlett*, 98 F.3d 721, 724–25 (2d Cir.1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.*, 235 F.3d 804, 810 (2d Cir. 2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." *Su v. Filion*, 335 F.3d 119, 126 n. 3 (2d Cir.2003) (citing *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir.2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." *Id.*

E. Actual Innocence

■■■ "[A] habeas petitioner may also bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, *i.e.*, that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 729 (2d Cir.2002).

■■■ Because habeas corpus "is, at its core, an equitable remedy," *Schlup v. Delo*, 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court has stated that "in appropriate cases, the principles of comity and finality that in-

form the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration," *id.* at 320–21, 115 S.Ct. 851 (quotations omitted). To ensure that this exception remains rare and will be applied only in the extraordinary case, the Court has "explicitly tied" the miscarriage of justice exception to the petitioner's innocence. *Id.* at 321, 115 S.Ct. 851. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence ... that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* at 324, 115 S.Ct. 851.

■■■ A showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim. *See Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). A habeas court is, in short, concerned " 'not [with] the petitioners' innocence or guilt but solely [with] the question whether their constitutional rights have been preserved.' " *Id.* (quoting *Moore v. Dempsey*, 261 U.S. 86, 87–88, 43 S.Ct. 265, 67 L.Ed. 543 (1923)); *cf. Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (habeas court may review an *independent constitutional claim* that the evidence adduced at trial was insufficient to convict a criminal defendant beyond a reasonable doubt); *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (reversing conviction of "Shuffling Sam" *on direct review* from conviction in Louisville's police court

where there was no evidence that defendant violated city ordinances)

## F. Certificate of Appealability

A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253; *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The court has taken into account the rule of section 2253(c)(3) of Title 28 of the United States Code that a certificate of appealability "shall indicate which specific issue or issues satisfy the [substantial showing of the denial of a constitutional right] required by paragraph (2)." *See also Shabazz v. Artuz*, 336 F.3d 154, 160 (2d Cir.2003).

This opinion complies with *Miranda v. Bennett*, 322 F.3d 171, 175–77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure. No other issue open to consideration by this court has merit. *See Sumner v. Mata*, 449 U.S. 539, 548, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit").

## III. Analysis

Petitioner was convicted and sentenced on January 5, 1983. His conviction was affirmed by the Appellate Division on February 28, 1986. Leave to appeal to the New York Court of Appeals was denied on May 21, 1986. Petitioner did not seek a writ of certiorari from the Supreme Court. His conviction was therefore final 90 days later, on August 19, 1986.

Because his conviction became final before the effective date of AEDPA, petitioner had until April 24, 1997 in which to file his application for a writ of habeas corpus.

Ten days before this deadline, petitioner filed his initial application. At petitioner's request, the application was dismissed on January 20, 1999 so he could exhaust state remedies.

On August 30, 2000, which was 588 days later, petitioner moved to vacate his judgment of conviction before the state trial court. The court denied the motion on December 5, 2000, concluding, *inter alia,* that petitioner had failed to proceed with due diligence in litigating his claim of newly discovered evidence since the FOIL documents relied upon by petitioner had been in his possession since at least September 1, 1993. Leave to appeal to the Appellate Division was denied on February 8, 2001. The 189–day period during which this proceeding was pending tolls the AEDPA limitations period by statute.

Petitioner filed the instant habeas application 169 days later, on July 27, 2001. Excluding time tolled by statute and the time during which his initial application was pending in this court, his application is out of time by 787 days, or over two years.

▮▮▮▮ Petitioner's initial filing of his habeas application in 1997 does not save the instant application from being time-barred. Prisoners cannot circumvent the strict AEDPA limitations period by invoking the "relation back" doctrine by arguing that a new petition should be treated as having been filed on the same day as a first petition. As the Court of Appeals has explained,

> If [the limitations period] were interpreted as Petitioner argues, the result would be impractical. A habeas petitioner could file a non-exhausted application in federal court within the limitations period and suffer a dismissal without prejudice. He could then wait decades to exhaust his state court remedies and could also wait decades after exhausting his state remedies before returning to federal court to "continue"

his federal remedy, without running afoul of the statute of limitations. *Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir.2000) (quoting *Graham v. Johnson*, 168 F.3d 762, 780 (5th Cir.1999)).

At the hearing before this court, petitioner suggested that he is entitled to equitable tolling because he has diligently pursued his claims. The argument is rejected. Petitioner was in possession of the FOIL reports that he now relies upon by 1993 at the latest. He did not proceed with anything approaching reasonable diligence. No extraordinary circumstances beyond his control prevented him from filing a timely habeas application.

■ To the extent petitioner contends that his FOIL requests statutorily tolled the limitations period, the argument has been rejected by the Court of Appeals for the Second Circuit, which has explained that the purpose of Article 78 (FOIL) proceedings is to discover material that might aid in a challenge to the conviction rather than a challenge to the conviction itself, and that "if a filing of that sort could toll the AEDPA limitations period, prisoners could substantially extend the time for filing federal habeas petitions by pursuing in state courts a variety of applications that do not challenge the validity of their convictions." *Hodge v. Greiner*, 269 F.3d 104, 107 (2d Cir.2001) (holding open the possibility that in an appropriate case an Article 78 proceeding could be the functional equivalent of an application for state postconviction or other collateral review). Petitioner's FOIL request was not the functional equivalent of a collateral attack on his conviction.

The *Hodge* court explained that "[i]f a prisoner believes he is entitled to discovery in aid of a state or federal collateral attack, his remedy is to seek such relief from the court where a properly filed and timely collateral attack on his conviction is pending." *Id.* Thus, even assuming the

state did not respond appropriately to his FOIL request and that petitioner had a procedural due process right to receive FOIL information, he cannot show that there was an "impediment to filing an application created by State action in violation of the Constitution or laws of the United States," 28 U.S.C. § 2244(d)(1)(D), that might reset the limitations period.

■ Petitioner's claim that the limitations period should be equitably tolled during the pendency of his FOIL request is likewise unavailing. As in the *Hodge* case, petitioner was in no way prevented from filing a petition for a writ of habeas corpus and then seeking discovery pursuant to Rules 6 and 7 of the Rules Governing Section 2254 Cases in the United States District Courts. *See also Castillo v. Artuz*, 2000 WL 307373, at *4 (E.D.N.Y. Feb. 15, 2000). Alternatively, he could have asked this court to keep his habeas case pending while he sought discovery through his FOIL requests.

The Court of Appeals for the Second Circuit has found that, where a petitioner's AEDPA limitations period is nearly expired, a reasonable period of time for a petitioner to initiate state collateral proceedings is thirty days and a reasonable period of time in which to seek to reopen federal proceeding following a state court decision is also thirty days. *See Zarvela v. Artuz*, 254 F.3d 374, 380–81 (2d Cir.2001). Equitable tolling for these brief periods would, accordingly, be appropriate where a petition has been stayed or dismissed to allow for exhaustion in the state courts. Petitioner contends that the thirty-day periods discussed in *Zarvela* do not define the outer limits of acceptable periods for proceeding with diligence, and that whether equitable tolling is warranted or not depends upon the unique circumstances of the individual case. Accepting for argument's sake petitioner's reading of *Zarvela*, petitioner was not reasonably diligent

during the 588 days between the dismissal of his initial habeas application and the initiation of state court proceedings; he likewise did not proceed with reasonable diligence during the 169 days between the completion of his state court proceedings and the filing of the instant habeas application.

■■■ Petitioner argues that the time bar should be forgiven because he is actually innocent of the crime of conviction and that to enforce a limitations period under such circumstances would violate the Suspension Clause. The "question of whether the Suspension Clause of the Constitution requires that we read an 'actual innocence' exception into AEDPA's statute of limitations" is an open one in this circuit. *Lucidore v. N.Y. State Div. of Parole,* 209 F.3d 107, 114 (2d Cir.2000).

The Court of Appeals for the Second Circuit has advised the district courts on how to proceed in similar circumstances, instructing that the following questions should be addressed "sequentially":

> (1) Did [the petitioner] pursue his actual innocence claim with reasonable diligence? (2) If [the petitioner] did not pursue the claim with reasonable diligence, must an actual innocence claim be pursued with reasonable diligence in order to raise the issue of whether the United States Constitution requires an "actual innocence" exception to the AEDPA statute of limitations? (3) If [the petitioner] did pursue the claim with reasonable diligence or if reasonable diligence is unnecessary, does [the petitioner] make a credible claim of actual innocence? (4) If [the petitioner] does make a credible claim of actual innocence, does the United States Constitution require an "actual innocence" exception to the AEDPA statute of limitations on federal habeas petitions?

*Whitley v. Senkowski,* 317 F.3d 223, 225–26 (2d Cir.2003). It is unclear why the

Court of Appeals has directed that this is the "appropriate order of inquiry," *id.* at 226 n. 1, since in many cases the easiest of the four queries for the district court will be to ascertain whether or not a petitioner has a credible claim of actual innocence.

In the instant case, addressing the Court of Appeals' list sequentially would require this court—after determining as a factual matter that petitioner's actual innocence claim was not pursued with reasonable diligence—to address the difficult legal question of whether such a claim must be pursued with reasonable diligence in order to raise the issue of whether the United States Constitution requires an "actual innocence" exception to the AEDPA statute of limitations. Addressing this latter question would be improvident if petitioner cannot make a credible claim of actual innocence. Because petitioner does not make a credible claim of actual innocence, this court will move directly to the third item in its list.

■■■ "In order to demonstrate actual innocence in a so-called collateral proceeding, a petitioner must present 'new reliable evidence that was not presented at trial' and 'show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" *Lucidore,* 209 F.3d at 114 (quoting *Schlup v. Delo,* 513 U.S. 298, 299, 327–28, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). The Supreme Court "has made clear that 'the concept of 'actual[ ]' ... innocence' is distinct from the concept of 'legal[ ] innocence.'" *Poindexter v. Nash,* 333 F.3d 372, 380 (2d Cir.2003) (quoting *Smith v. Murray,* 477 U.S. 527, 537, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986)). The concept of actual innocence "normally means simply that the defendant did not commit the crime." *Id.*

Determining whether, for purposes of avoiding the AEDPA limitations period, a

petitioner is actually innocent of the crime for which he was convicted, poses the question whether a federal court may appropriately take into consideration evidence against him that was suppressed by the trial court. When such evidence is taken into account—including primarily petitioner's inculpatory statement to police—petitioner plainly cannot make out a case of actual innocence for purposes of this petition. That evidence would have been available under federal practice. Consideration of such evidence suppressed on state grounds would, in this court's view, be proper. Reliance on this evidence is, however, unnecessary in the instant case.

Because this is a civil suit, the burden of proof with respect to actual innocence is assumed to be, for the purposes of the instant case, a preponderance of the evidence. Plaintiff has not met even that low burden in view of the great weight of evidence against him. An alleged co-perpetrator confessed and implicated petitioner at trial; a co-defendant's statement implicated petitioner; an assistant district attorney and two court personnel testified that they heard petitioner admit to the shooting during his arraignment; and a bullet was found in petitioner's pocket that had been chambered in the same gun as a shell casing recovered at the crime scene. These items demonstrate that petitioner has not established that he is actually innocent of the shooting of the victim.

Recantations of the testimony of some prosecution witnesses have themselves been subject to recantation. This court need not decide which of their conflicting affidavits are credible because the instant proceeding is not an opportunity for petitioner to attempt to retry his case. He has failed to establish innocence for purposes of the AEDPA limitations period.

Because petitioner had not made a credible claim that he was actually innocent of Squire's shooting, it is unnecessary to determine whether there has been a Suspension Clause violation. Petitioner's habeas application is untimely.

Petitioner's *Brady* claim is rejected. Leaving aside the fact that the claim was denied by the state courts on what appear to be adequate state procedural grounds that would preclude review in this court, the evidence petitioner received pursuant to his FOIL requests has nothing to do with the criminal investigation in his case. The FOIL documents are a red herring. No trial judge would have permitted them to be introduced in evidence or used on cross examination of the police officers or ballistics experts.

IV. Conclusion

The petition for a writ of habeas corpus is dismissed as time-barred.

No certificate of appealability is granted with respect to any of petitioner's claims, petitioner having made no substantial showing of the denial of a constitutional right.

SO ORDERED.